COLLEEN J. HANNON *v.* MICHAEL R. REDLER
(AC 29257)

Bishop, Harper and Schaller, Js.

Argued April 28—officially released September 29, 2009

*George Markley,* with whom was *Richard G. Kent,* for the appellant (defendant).

*David J. Elliott,* with whom was *Laura J. Martella,* for the appellee (plaintiff).

*Opinion*

HARPER, J. The defendant, Michael R. Redler, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Colleen J. Hannon. On appeal, the defendant claims that the court improperly (1) determined the value of his interest in his medical practice, (2) determined the net equity in his home, (3) determined his income and (4) ordered alimony and a distribution of assets to the plaintiff. We affirm the judgment of the trial court.

The parties were married on September 12, 1981. At the time of dissolution, the parties had four adult children born of the marriage, two of whom were ages twenty and twenty-two.[1] The plaintiff was the director of human resources for a company named Alenia North America. The defendant was an orthopedic surgeon in a medical practice named Orthopedic and Sports Medicine Center (medical practice). The medical practice was a limited liability company, which the defendant started in late 1994 "in partnership with" other persons. After four days of trial, the court dissolved the parties' marriage by a memorandum of decision filed on September 28, 2007. The court found that the parties had been separated and living apart since January, 2004. It found that the marriage had broken down irretrievably and entered various financial orders. In relevant part, it ordered the defendant to pay $4000 per month[2] in alimony until the children finished college or until October 31, 2011, whichever occurred first. Thereafter, an increase in the alimony was ordered for a total of $6000 per month until the year 2022.[3] The court also made factual findings as to the value of the parties'

---

[1] The other two children were older than twenty-three.

[2] Payments began retroactively dating back to May 29, 2007, in response to the plaintiff's motion for alimony pendente lite, filed on May 11, 2007.

[3] Payments would terminate earlier than 2022 if the plaintiff remarried, upon the death of either party or pursuant to General Statutes § 46b-86 (b).

assets and their respective incomes and distributed the assets according to its findings. This appeal followed. Additional facts will be set forth as necessary.

At the outset, "[t]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Elia* v. *Elia*, 99 Conn. App. 829, 831, 916 A.2d 845 (2007). "With respect to the financial awards in a dissolution action, great weight is given to the judgment of the trial court because of its opportunity to observe the parties and the evidence." (Internal quotation marks omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 530, 752 A.2d 978 (1998).

I

First, the defendant claims that the court improperly determined the value of his interest in the medical practice by inferring a value significantly higher than its

actual value at the time of the dissolution. Specifically, the defendant argues that the court lacked sufficient evidence to determine the value of his interest. We disagree.

The following additional facts are relevant to the defendant's claim. During the first day of trial, the plaintiff testified that she assisted the defendant and his medical business "partners" with the startup of the medical practice from 1993 to 1994 and had purchased computers, desks and supplies for the office. She testified that she worked for eight to nine months with the defendant, planning the startup of the medical practice. The plaintiff also testified that the defendant admitted to her during the marriage that the value of his interest in the medical practice was $500,000 and that when he started the medical practice, the initial buyout during that time was valued at $500,000. Later during that first day of trial, the court noted that the defendant claimed on his financial affidavit that the total cash value of all of his assets was zero. During the second day of trial, one of the defendant's business partners, Stuart Belkin, a physician, testified that the medical practice had a buyout agreement that entitled a business partner who retired at the age of sixty-five to receive a buyout of his interest valued at $500,000.

By the end of trial, no buyout agreement had been produced to the court, and the defendant offered no evidence to assist the court as to the current value of his interest in the medical practice. The court found, in its memorandum of decision, that the defendant's interest in the medical practice was valued at $500,000. The defendant argues that there was insufficient evidence for the court to determine the value of his interest in the medical practice. The defendant also asserts that because neither party produced sufficient evidence of the present value of his interest in the medical practice, the court could not infer or estimate a value.

"In distributing the assets of the marital estate, the court is required by [General Statutes] § 46b-81 to consider the estate of each of the parties. Implicit in this requirement is the need to consider the economic value of the parties' estates. The court need not, however, assign specific values to the parties' assets. . . . In assessing the value of the assets that comprise the marital estate, the trial court functions as the trier of fact. The trial court has the right to accept so much of the testimony . . . as [it] finds applicable . . . . [It] arrives at [its] own conclusions by weighing the opinions of the appraisers, the claims of the parties, and [its] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . In selecting and applying an appropriate valuation method, the trial court has considerable discretion. . . . The trial court's findings will be overturned only if it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Citations omitted; internal quotation marks omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 531–32.

"[When] the factual basis of the court's decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the record or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . Further, a court's inference of fact is not reversible unless the inference was arrived at unreasonably. . . . We note as well that [t]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the

material fact. . . . Moreover, it is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and *determine whether to accept some, all or none of a witness' testimony.* . . . Thus, if the court's dispositive finding here was not clearly erroneous, then the judgment must be affirmed." (Citations omitted; emphasis added; internal quotation marks omitted.) *Levy, Miller, Maretz, LLC* v. *Vuoso,* 70 Conn. App. 124, 130–31, 797 A.2d 574 (2002).

The issue before us is whether the court's finding that the value of the medical practice was $500,000 was clearly erroneous in light of the evidence in the record. We conclude that it was not. As shown in the record, the court had sufficient evidence before it, by way of testimony during the four day trial, to determine a value for the medical practice. To dispute this, the defendant argues that there was a lack of evidence before the court to enable the court to find a value of his interest in the medical practice. The record reflects that the defendant failed to provide the court with sufficient evidence to assist the court in determining the value of his interest in the medical practice. Nonetheless, the lack of evidence from the defendant did not preclude the court from determining the value of his interest in the medical practice and providing an equitable distribution of this asset. It was not improper for the court to value the asset, by way of the testimony before it, on the basis of the buyout agreement's value of the defendant's interest in the medical practice. As noted previously, the court, as trier of fact, was free to accept any, all or none of the testimony before it on the issue relating to the value of the defendant's interest in the medical practice. See, e.g., *Gyerko* v. *Gyerko,* 113 Conn. App. 298, 305, 966 A.2d 306 (2009).

Further, the defendant had notice that his interest in the medical practice might be distributed, and his decision not to provide the court with evidence as to

the current value of his interest is not a decision about which he can later complain. Our Supreme Court, in *Bornemann* v. *Bornemann*, supra, 245 Conn. 508, noted that "when neither party in a dissolution proceeding chooses to introduce detailed information as to the value of a given asset, neither party may later complain that it is not satisfied with the court's valuation of that asset. Both parties in a dissolution proceeding are required to itemize all of their assets in a financial affidavit and to provide the court with the approximate value of each asset. . . . If the parties fail to do so, the equitable nature of the proceedings precludes them from later seeking to have the financial orders over-turned on the basis that the court had before it too little information as to the value of the assets distributed." (Citation omitted.) Id., 535–36.

In light of the testimony and evidence presented at trial, we conclude that there was sufficient evidence before the court to support its factual finding that the defendant's medical practice was valued at $500,000 at the time of dissolution.

## II

Next, the defendant claims that the court improperly determined the net equity in his home in failing to deduct from the net equity a loan that a girlfriend, Michelle Clark, made to him when he purchased the property. We are unpersuaded.

The following additional facts are relevant to the defendant's claim. The court found that the parties were separated in January, 2004, but living in separate bedrooms within their marital home in Fairfield on Lookout Drive. In June, 2004, the parties purchased a beachfront home in Milford on Seaview Avenue. The plaintiff immediately moved out of the marital home on Lookout Drive and began living in the Seaview Avenue property. The defendant remained in the marital home. In December,

2004, the marital home was sold, and the defendant rented a house for the next six months in Fairfield. In June, 2005, the defendant moved in with the plaintiff. Thereafter, the parties formally agreed to divorce in October, 2005. In January, 2006, the plaintiff filed for marital dissolution. In November, 2006, less than one year after the plaintiff filed the marital dissolution action, the defendant moved out of the plaintiff's home on Seaview Avenue and purchased a new home for himself in Fairfield on South Pine Creek Road, the property at issue. The cost of the new home was approximately $1.36 million. To purchase the new home, the defendant used $54,000 from the home equity line of credit on the Seaview Avenue property, $220,000 in cash loaned to him by Clark and $1.08 million in a mortgage loan. The defendant testified that he sporadically repaid the loan to Clark, but he could not recall the exact amount that had been repaid.

The defendant submitted two financial affidavits to the court, one on February 20, 2007, and the other on July 3, 2007. In both financial affidavits, the defendant listed his debt liability as either zero or left the space blank. During the four day trial, the court heard testimony from the defendant that he borrowed money from Clark and was obligated to pay it back. The court also heard testimony from Clark that the loan did not require a monthly payment and that the defendant was obligated to pay the loan when he was capable of doing so or upon the sale of other real estate that he owned. Clark testified that there was a promissory note executed that detailed the loan agreement terms and that the note was created by her attorney. In addition, when Clark was asked whether the defendant requested a loan to purchase the property, Clark testified that she offered the loan to the defendant. The defendant did not produce the note to the court. In its memorandum of decision, the court valued the net equity on the South Pine

Creek Road property as $280,000. The defendant asserts that the court's determination of the net equity does not reflect the debt to Clark.

The court made no finding as to whether the loan by Clark was a gift or a debt. It further did not state the basis for its calculation of the net equity on the defendant's home. The defendant failed to seek an articulation with respect to the basis of the net equity value. Without an articulation to clarify this issue, we would be forced to speculate as to whether the court improperly failed to reduce the net equity of the defendant's home by the amount of the loan to Clark. "An articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear. . . . It is the responsibility of the appellant to provide an adequate record for review as provided in [Practice Book §] 61-10. . . . Conclusions of the trial court cannot be reviewed where the appellant fails to establish through an adequate record that the trial court incorrectly applied the law or could not reasonably have concluded as it did. . . . When the trial court does not provide the necessary factual and legal conclusions, either on its own or in response to a proper motion for articulation, any decision made by us respecting this claim would be entirely speculative." (Internal quotation marks omitted.) *Gyerko* v. *Gyerko*, supra, 113 Conn. App. 317–18. The failure to seek an articulation leaves us without the ability to engage in a meaningful review. Accordingly, we cannot conclude that the court's calculation was improper.

### III

Next, the defendant claims that the court improperly determined his gross and weekly income when it failed to consider an updated financial affidavit submitted to the court, which reflected a significantly lower figure

than what was first presented to the court. We are unpersuaded.

The following additional facts are necessary to the defendant's claim. The defendant submitted two financial affidavits to the court in 2007. The first financial affidavit was submitted on February 20, 2007.[4] On the first day of trial, the defendant's counsel stated to the court that the defendant had provided his accountant with information to complete his February 20, 2007 financial affidavit. The defendant's counsel also provided the court with a document titled, "Statement of Financial Condition," dated for 2006, that was completed by the defendant's accountant. The defendant's counsel confirmed that the defendant had reviewed the documents for accuracy. On the second day of trial, Belkin testified that there was no increase or decrease in patient visits during the past year. He testified that the flow of patients had been consistent since the start of the medical practice and that the defendant had remained consistently busy. He further testified that five out of the six business partners, including the defendant, had received a consistent base rate in their biweekly paychecks for several years. He testified that the five partners, including the defendant, received $320,000 annually, in addition to their quarterly bonuses that ranged from zero to $50,000.

In addition, Belkin testified that generally, out of the four quarterly bonuses, two would have a zero value. He testified that the last quarterly bonus was in December, 2006, in the amount of $50,000. He also testified that their first quarterly bonus for 2007 was expected to be $20,000. Belkin went on to testify that the quarterly bonuses and fixed base rate were the only two forms of income received by each partner from the medical

[4] On the defendant's February 20, 2007 financial affidavit, his net weekly income was $6400.

practice. He testified that the income of the partners has dropped by 4 to 5 percent during the past four to five years, starting in about 2004. On the third day of trial, the defendant testified that his annualized income, which included his bonuses, was $460,000. The defendant also testified that his current financial affidavit, which was submitted to the court on the first day of trial, consisted of financial data and expenses from 2005 because he did not have the expense information for 2006. He testified that he did not have the 2006 expenses because the paperwork for his taxes for 2006 was not yet completed. He acknowledged that some of the expenses for 2005 that were listed in his February 20, 2007 financial affidavit did not carry over into 2006. He testified, however, that he was unable to differentiate on his February 20, 2007 financial affidavit which expenses were relevant solely to 2005 as opposed to 2006.

On the final day of trial, July 3, 2007, some three months later, the defendant submitted an updated financial affidavit for 2007,[5] along with a revised statement of financial condition for 2007. Upon commencement of the final day of trial, the defendant testified that, in 2006, his annualized income was $460,000 but that his income for 2007, however, was significantly less. The defendant testified that his present financial earnings were $7700 biweekly with expenses consisting of a $7800 mortgage, $3000 a month for his children's living expenses and weekly expenses for the home. The defendant testified that he was living from paycheck to paycheck. He further testified that his income in the past two years averaged $466,000 per year.

Also on the final day of trial, Kelly Poulin, the administrator for the medical practice, testified. She stated that revenue was declining because insurance companies

[5] On the defendant's July 3, 2007 financial affidavit, his net weekly income was $4513.

were paying less for services. She also testified that if insurance payments were reduced, the medical practice would not have "the money to pay out in bonuses . . . just salary." The court, in its memorandum of decision, found that the defendant's annualized income was $484,000 and that his net weekly income was $6400.

The court noted that the defendant's weekly income was 80 percent more than the plaintiff's net weekly income, which was $1303. The defendant argues that it was improper for the court to make such findings regarding his income because the numbers did not reflect the updated financial affidavit that was submitted on the last day of trial. He asserts that the court completely ignored the updated financial affidavit and did not offer a reason as to why it did so.

As previously noted, because we are reviewing the court's factual findings as to the defendant's income, we look to see whether the court's findings are clearly erroneous, and we must affirm the court's decision unless there is either no evidence to support the court's findings or we are left with a definite and firm conviction that a mistake has been committed. After a careful review of the record, we cannot say that the court's findings were clearly erroneous.

For comparison purposes, we refer to this court's decision in *Gervais* v. *Gervais*, 91 Conn. App. 840, 882 A.2d 731, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005). In *Gervais*, this court found an abuse of discretion when the trial court did not consider an updated financial affidavit submitted to it prior to a hearing on a motion to terminate alimony. Id., 845. The transcript in *Gervais* reflected that the defendant was extensively questioned on the updated financial affidavit during the hearing. Id. In response to a request for an articulation, the trial court twice commented that the defendant had failed to file an updated financial affidavit. Id. This court noted

that a trial court should consider the present financial circumstances of the parties before entering financial orders relevant to a marital dissolution. Id., 845–48. Because the trial court's articulation reflected that it did not consider the financial affidavit that clearly had been submitted to the trial court, this court found that the trial court abused its discretion and that its findings were erroneous. Id. Nonetheless, this court noted that had the trial court actually reviewed the amended financial affidavit, as the trier of fact, "it could have accepted or rejected the information contained therein." Id., 848.

In the present case, the record does not reflect that the court improperly failed to consider a financial affidavit that was clearly before it. Here, the defendant failed to seek an articulation of whether the court considered his updated financial affidavit to determine his income. Any further review of the court's failure to consider the updated financial affidavit for its findings would be speculative. As previously noted, great weight is given to the judgment of the trial court, and, absent any indication to the contrary, we presume that the court acted properly. Because the defendant did not move for an articulation of the court's determination of his income pursuant to Practice Book § 66-5 and because there was sufficient evidence to support the court's finding, we cannot conclude that the court's finding was clearly erroneous.

IV

Last, the defendant claims that the court abused its discretion when it ordered alimony to the plaintiff and distributed the parties' assets to his detriment. The defendant argues that the court's order of alimony and the distribution of assets are improper because they are based on improper factual findings made by the court. Specifically, the defendant references his arguments that we considered in parts I, II and III of this

opinion, which were that the court improperly made factual findings as to the value of certain property and as to his income. We are unpersuaded.

"In fashioning its financial orders, the court has broad discretion, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . That standard of review reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Citation omitted; internal quotation marks omitted.) *Mann* v. *Miller*, 93 Conn. App. 809, 812, 890 A.2d 581 (2006).

As previously noted, "[i]n distributing the assets of the marital estate, the court is required by . . . § 46b-81 to consider the estate of each of the parties. . . . [Section] 46b-81 (a) provides in relevant part: 'At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either the husband or wife *all or any part of the estate of the other.* . . .' Courts are not required to ritualistically recite the criteria they considered, *nor are they bound to any specific formula respecting the weight to be accorded each factor in determining the distribution of marital assets.*" (Citation omitted; emphasis added.) *Mann* v. *Miller*, supra, 93 Conn. App. 812.

The defendant's claim rests on the assertion that the court's findings on the value of his interest in the medical practice, his property and his income were erroneous. As a result, the defendant argues that the court's

financial orders for alimony and a distribution of assets are also improper because the financial orders rest on erroneous findings. The defendant has crafted his argument premised on his belief as to the correct values of his assets and income. He asserts that when this court considers the proper values, as claimed in his brief, of his assets and income, the court's financial orders result in negative net worth for the defendant of approximately $51,000.[6] The defendant appears to assert that the court improperly formulated the distribution of assets and alimony. Specifically, the defendant argues that the record does not support the court's orders. In light of our review of the entire record, we conclude that the record supports the court's financial orders and that the court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] The defendant originally briefed that his negative net worth was $96,750. In oral argument to this court, however, the defendant corrected that figure and argued, instead, that the financial orders resulted in a negative net worth of $51,000.