******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JENNIFER GRANT *v.* WINSTON GRANT
(AC 37658)

DiPentima, C. J., and Beach and Sheldon, Js.*

*Submitted on briefs December 2, 2016—officially released March 28, 2017*

(Appeal from Superior Court, judicial district of Fairfield, Hon. Howard T. Owens, Jr., judge trial referee.)

*David N. Rubin*, for the appellant (defendant).

*Marissa L. Bigelli*, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, C. J. The defendant, Winston Grant, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Jennifer Grant, and entering related financial orders. On appeal, the defendant claims that the court abused its discretion in (1) finding him in contempt for violating the court's automatic orders, (2) ordering him to pay the plaintiff $30,425.98[1] from his retirement account within thirty days from the judgment and (3) finding that he owned real property in Jamaica and ordering him to pay the plaintiff $20,000 reflecting the plaintiff's contributions to that property within four[2] years. We agree with the defendant. Accordingly, we reverse in part the judgment of the trial court and remand the matter for further proceedings in accordance with this opinion.

The following facts, which either were found by the court in its memorandum of decision or are undisputed in the record, and procedural history are relevant to our consideration of the issues raised on appeal. The parties were married on September 21, 1996, and did not have any children. The plaintiff commenced the present action seeking dissolution of the parties' marriage on April 9, 2014. The commencement of this action included service of notice of the automatic orders in accordance with Practice Book § 25-5.[3] At that time, the parties' two main assets of any significance were their jointly owned multifamily house located at 391 Summerfield Avenue in Bridgeport where the plaintiff was residing and the defendant's Chase retirement account worth $76,064.97.

On September 16, 2014, several months prior to the dissolution trial, the plaintiff filed a motion for contempt, alleging that the defendant had violated the automatic orders. She also filed a motion for order regarding the defendant's retirement account in which she requested that the court order the defendant to cease withdrawing funds from that account, to immediately replenish the account and for the remaining cash in that account to be placed into a trust account until trial.[4] On September 26, 2014, the defendant filed an objection to the motion for contempt to which he affixed an accounting of expenses document.

On January 15, 2015, the court, *Hon. Howard T. Owens, Jr.*, judge trial referee, rendered judgment dissolving the parties' marriage and entered financial orders in a written memorandum of decision. With regard to the issues in this appeal, the court made the following findings and entered the following financial orders. In § 3 of its memorandum of decision, the court expressly stated: "The evidence is clear that the [defendant] has substantially depleted his retirement account. Subsequent to the service of the complaint in this matter, he had available $76,064.97 in his retirement

account. On April 21, 2014, and April 23, 2014, he totally depleted said account and paid taxes and penalties thereon. His withdrawals were clearly in violation of the court's [automatic] orders and the court finds his conduct wilful and finds him in contempt. He shall immediately transfer the current value of his [retirement account] to [the plaintiff] (approximately $6700) and shall pay to her the sum of 40 percent of the $76,064.97 [i.e., $30,425.98] that he had in his depleted retirement [account] after being given a credit for interest and penalties paid thereon. Said sum shall be paid within thirty days from the date of this judgment." In § 4, the court ordered: "The real property located at 391 Summerfield Avenue in Bridgeport shall be owned exclusively by the [plaintiff], and [she] shall be entitled to the rental income both current and past." In § 5, the court ordered: "The real estate in Jamaica shall be the exclusive property of the [defendant]. However, the [defendant] shall pay to the [plaintiff] the sum of $20,000 that she has contributed to its upkeep and maintenance when said real estate is sold. If [the property] is not sold within four years, said sum, $20,000, shall be due and payable at that time . . . ." The defendant filed the present appeal, challenging the court's contempt finding and these financial orders.

On April 13, 2015, the defendant filed a motion for articulation in which he asked the trial court to articulate, among other things, whether it concluded that he had violated the automatic orders provisions of Practice Book § 25-5 by depleting his retirement account to pay for such things as taxes, attorney fees, rent, food and furniture. The defendant also asked the trial court to articulate whether it concluded that he owned the property in Jamaica, and if so, the basis for this factual finding. On May 11, 2015, the court denied the defendant's motion for articulation. On May 19, 2015, the defendant filed with this court a motion for review of the trial court's denial of his motion for articulation, which was granted, and this court ordered the relief requested by the defendant. On August 18, 2015, the trial court filed responses in accordance with our order. In its articulation, the trial court explained that it found the defendant in violation of the automatic orders, that the defendant had spent $76,064.97 from his retirement account on customary and usual household expenditures which it further stated were not in violation of the automatic orders, and that the defendant was the exclusive owner of the property in Jamaica, but the court did not cite any evidence supporting its findings.

On August 27, 2015, the defendant filed with this court a second motion for review of the trial court's failure to fully respond to his requests for articulations four and six, which asked what amount of his retirement account it determined to be spent on customary and usual household expenditures and the amount that was spent on expenditures in violation of the court's auto-

matic orders. This court granted both the motion and the relief requested therein and ordered the trial court to articulate: "(1) what amount of the [defendant's] retirement funds it determined that [he] had properly spent on ordinary household expenditures and what were those expenditures; and (2) what amount of the husband's retirement funds it determined the husband had spent on expenditures that were violative of the automatic court orders and what were those expenditures." On November 18, 2015, the trial court responded by articulating: "(1) On April 21, and April 23, 2014, subsequent to the service of the complaint in this matter, [the defendant] had in his retirement account $76,064.97. Subsequent to the service of the complaint, he withdrew over a period of time all of said sums from his savings with the exception of $6000. [The sum of] $10,498 was used to satisfy his tax obligations thereto. The withdrawals also occurred subsequent to the date of service of the complaint (April 9, 2014). He had a tax obligation of approximately $14,000. In addition, he spent money for furniture and rental expenses, according to his testimony. In addition, [the defendant] claims to have expended $950 per month in rental at an apartment occupied on Pearl Harbor Street in Bridgeport. (2) Expenses for food, clothing and alleged rental expenditures. At the time of dissolution, [the defendant] had depleted approximately $70,000 from his savings account."

On November 24, 2015, the defendant filed with this court his third motion for review of the trial court's articulation, which we granted but denied the relief requested therein. Additional facts will be set forth as necessary.[5]

We begin by setting forth the relevant standard of review of the court's orders. "[I]n domestic relations cases . . . this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . .

"With respect to the factual predicates for financial awards [and] the distribution of property . . . our standard of review is clear. This court may reject a factual finding if it is clearly erroneous, in that as a matter of law it is unsupported by the record, incorrect, or otherwise mistaken. . . . The fact-finding function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor

and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Appellate review of a factual finding, therefore, is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Anderson* v. *Anderson*, 160 Conn. App. 341, 343–44, 125 A.3d 606 (2015). Guided by these principles, we address in turn each of the defendant's claims.

I

The defendant first claims that the trial court abused its discretion in finding him in contempt for violating the court's automatic orders. Specifically, the defendant argues that the court erred in its finding that he expended funds from his retirement account in violation of the automatic orders when the court failed to identify the specific expenditures that violated such orders. In turn, the plaintiff contends that the court concluded on the basis of clear and convincing evidence that the defendant had violated the automatic orders. We agree with the defendant.

The following additional facts are relevant to this claim. As discussed previously, the court granted the plaintiff's motion for contempt on the ground that the defendant's depletion of his retirement account was wilful. In its August 18, 2015 articulation, the court stated that the specific expenditures that violated the automatic orders totaled $76,064.97. On appeal, the defendant claims that the court's memorandum of decision and its August 18, 2015 articulation failed to establish by clear and convincing evidence that he was in contempt for violating the automatic orders. We agree.

To address the defendant's claim, we first set forth our well established standard of review for a finding of contempt. "A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [alleged contemnor] were in contempt of a court order." (Internal quotation marks omitted.) *Szynkowicz* v. *Szynkowicz*, 140 Conn. App. 525, 541, 59 A.3d 1194 (2013). We are mindful that the "court's automatic orders, applicable during the pendency of all marital dissolution actions, are set forth in Practice Book § 25-5 (b) and provide in relevant part: (1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household

expenses or for reasonable attorney's fees in connection with this action. . . . The purpose of the automatic orders in marital dissolution actions is to maintain the status quo of the assets within the marital estate so that they may be distributed by the court at the time of dissolution. . . . As provided in bold print at the end of Practice Book § 25-5, the [f]ailure to obey [the automatic] orders may be punishable by contempt of court." (Citations omitted; internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 161 Conn. App. 575, 590, 128 A.3d 595 (2015), cert. granted on other grounds, 320 Conn. 916, 131 A.3d 751 (2016).

In light of these legal principles, it is clear that a violation of the court's automatic orders will not arise when expenditures are used for customary and usual expenses. This court previously has analyzed several expenditures that constituted customary and usual household expenses, as set forth in Practice Book § 25-5 (b). See *Greenan* v. *Greenan*, 150 Conn. App. 289, 303–304, 91 A.3d 909, cert. denied, 314 Conn. 902, 99 A.3d 1167 (2014). In *Greenan*, this court rejected the plaintiff's claim "that the [trial] court erred in finding him in contempt of the automatic orders because there was no evidence that he expended funds on anything other than legal fees, modest living expenses and emergency property repairs." Id., 303. In support of its conclusion, this court expressly stated "that, although some degree of extra expense was necessary to establish the plaintiff's separate housing and secure legal representation, the plaintiff, without the knowledge or consent of the defendant, mortgaged assets, took out loans and converted assets, exercising little or no restraint on his spending. Such spending reasonably could be found to be beyond the usual course of business or for customary and usual household expenses and assets were undisputedly encumbered." (Internal quotation marks omitted.) Id., 304.

In another case, this court determined that the trial "court reasonably could have reached the conclusion that the defendant violated the automatic orders in depleting the parties' joint account." *Czarzasty* v. *Czarzasty*, 101 Conn. App. 583, 596, 922 A.2d 272, cert. denied, 284 Conn. 902, 931 A.2d 262 (2007). In *Czarzasty*, "the [trial] court found that the defendant emptied the parties' joint financial account by withdrawing $31,500 less than two days after the commencement by the plaintiff of the divorce, excusing it by saying he needed money for attorney fees and other expenses. . . . By way of articulation, the court further found that, since 1997, the parties had maintained the joint account into which both of their salaries were regularly deposited and from which the monthly mortgage payment for the marital residence was automatically withdrawn. The defendant withdrew $31,500 from that account without consulting the plaintiff, leaving insufficient funds to cover the monthly mortgage payment"

and "although the defendant claimed that he needed the funds for counsel fees, there was no credible evidence that it was used for that purpose or for any other purpose allowed under the automatic orders," as set forth in Practice Book § 25-5 (b). (Internal quotation marks omitted.) Id., 596; cf. *Szynkowicz* v. *Szynkowicz*, supra, 140 Conn. App. 541–42 (plaintiff not in contempt for violating automatic orders when she used money from joint account for basic needs).

Mindful of this precedent, we conclude that the court abused its discretion in finding that the defendant violated the automatic orders when he used the money from his retirement account for customary and usual household expenses in accordance with Practice Book § 25-5 (b). With respect to our conclusion, we emphasize that the court's own articulation reflects that the defendant's depletion of his retirement account was for customary and usual household expenses and that the defendant did not fraudulently convey or conceal the disputed money. Specifically, the court responded to the defendant's request for articulation that asked: "State the total amount of expenditures that the court found violated the automatic orders that were for ordinary household expenditures, including rent, food, utilities, car expenses and gas," by stating "$76,064.97." The court's articulation, however, failed to identify any expenditure from the defendant's retirement account that violated the automatic orders. In failing to identify any expenditure which violated the automatic orders, the court failed to articulate any reason for the basis of its decision that found the defendant in contempt of the automatic orders.

There was evidence and testimony presented at trial establishing that the defendant used the money from his retirement account for the following: $14,000 in taxes, $9644.86 in furniture used to furnish the apartment he rented after moving out of the marital home, $950 a month for rental payments which he had paid for the past six months, $2000 used to travel to Jamaica for a funeral, along with expenditures used for food, cell phone payments, utilities, gas and attorney fees. This is distinguishable from *Czarzasty*, where there was no credible evidence that the defendant used the funds for counsel fees as he alleged or that he used the funds for any other purpose allowed under the automatic orders set forth in Practice Book § 25-5 (b). See *Czarzasty* v. *Czarzasty*, supra, 101 Conn. App. 596. According to our case law and Practice Book § 25-5 (b), the evidence submitted at trial showed that the use of these expenditures reasonably constituted customary and usual household expenses and, therefore, the defendant did not violate the automatic orders. Cf. id.; see also *Greenan* v. *Greenan*, supra, 150 Conn. App. 303–304.

There was evidence submitted at trial which estab-

lished that at the time the defendant depleted his retirement account, i.e., April 21, 2014, and April 23, 2014, he had been unemployed since February, 2013, and did not have a substantial source of income. The plaintiff resided in the marital property, which was in the process of being foreclosed, and, with the exception of the defendant's retirement account, he had minimal assets available to use for customary and usual household expenses and reasonable attorney fees. In light of the evidence and testimony as to the defendant's unemployment status and minimal available income and assets, with the exception of his retirement account, "it is not clear how [he] could have paid [his] own living and legal expenses independently." *Traystman* v. *Traystman*, 141 Conn. App. 789, 800–801, 62 A.3d 1149 (2013).

"As is often stated, we do not reverse the factual findings of the trial court unless they are clearly erroneous and find *no* support in the evidence." (Emphasis in original; internal quotation marks omitted.) *Szynkowicz* v. *Szynkowicz*, supra, 140 Conn. App. 542. Under the circumstances of this case, the court's finding the defendant in contempt for violating the automatic orders was clearly erroneous because the evidence at trial suggested that the defendant spent money from his retirement account for customary and usual household expenses. The court failed to identify any expenditures that violated the automatic orders in its articulation. See Practice Book § 25-5 (b). The court, therefore, abused its discretion with respect to this claim.

## II

The defendant next claims that the court abused its discretion in ordering him to pay the plaintiff $30,425.98 from his retirement account within thirty days of the judgment. Specifically, the defendant argues that the court erred in ordering him to pay the plaintiff $30,425.98 from his retirement account because it did not make any findings pertaining to his ability to comply with the order. We agree.

With respect to our conclusion, we are mindful that "[a]lthough a trial court is afforded broad discretion when distributing marital property, it must take into account several statutory factors. . . . These factors, enumerated in General Statutes § 46b-81, include the age, health, station, occupation, amount and sources of income, vocational skills, employability . . . and needs of each of the parties . . . . Although the trial court need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor, it must take each into account. . . . It is true that trial courts are empowered to deal broadly with property and its equitable division incident to dissolution proceedings." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 354–55, 880 A.2d 872 (2005). We

are also mindful, however, of the "long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards." Id., 361. Under the circumstances of this case, an award of 40 percent of the defendant's retirement account, i.e., $30,425.98 of the $76,064.97 which was in the account at the time the dissolution complaint was served, fails to satisfy this maxim.

Our review of the record does not reveal evidence that supports the trial court's determination that the defendant had the ability to pay the plaintiff $30,425.98 within thirty days of the January 15, 2015 judgment. In response to the defendant's motion for articulation, which asked: "Did the court find that, as of the date of judgment, that the defendant had the financial ability to pay [$30,425.98] to the plaintiff, and what was the factual basis of any such finding," the court stated that "[t]he defendant had the financial ability to pay as of the date of judgment. He had said sums from the depletion of his retirement account . . . ." At the time of judgment, however, the defendant's financial affidavit indicated that his assets included the $6700 in his retirement account and the $6499 in his checking account, and at trial the defendant testified that he depleted his retirement account subsequent to the service of the dissolution complaint in order to pay for household expenses, taxes and attorney fees. The evidence and testimony presented at trial also established that the defendant had been unemployed since February, 2013, and had no other source of income. In turn, the plaintiff's financial affidavit disclosed that she was employed and earned gross pay of $431 per week, as well as $438 per week from the rental income generated from the marital property which she was awarded in the dissolution proceeding.

We cannot find any evidence in the record to support the court's finding that the defendant had the ability to pay the plaintiff 40 percent of the $76,064.97 within thirty days of the judgment. Although mindful that "the [trial] court must be able to exercise its discretion in arriving at an equitable distribution, taking into consideration the needs and assets of both parties," we conclude that the court failed to weigh such considerations and abused its discretion with respect to this claim. (Internal quotation marks omitted.) *Picton* v. *Picton*, 111 Conn. App. 143, 152, 958 A.2d 763 (2008), cert. denied, 290 Conn. 905, 962 A.2d 794 (2009).

### III

The defendant's final claim is that the trial court abused its discretion in finding that he owned real property in Jamaica and ordering him to pay the plaintiff $20,000 within four years so as to reflect the plaintiff's contributions to that property. In particular, the defendant argues that the court erred in finding that he was the exclusive owner of the property in Jamaica when

it did not make any findings pertaining, inter alia, to the fair market value of the property, the location of the property or the defendant's ability to comply with the order. We agree with the defendant.

The following additional facts are relevant to our resolution of this claim. In its memorandum of decision, the court expressly noted: "The real estate in Jamaica shall be the exclusive property of the [defendant]. However, the [defendant] shall pay to the [plaintiff] the sum of $20,000 that she has contributed to its upkeep and maintenance when said real estate is sold. If it is not sold within four years, said sum, $20,000, shall be due and payable at that time . . . ." In its response to the defendant's request for articulation that asked: "Did the court find that the defendant had any ownership interest in a house in Jamaica? If so, what facts did the court rely on, and what percentage of ownership did the court find," the court stated that it found that the defendant was the sole owner of the property but failed to identify any facts to support its finding. The court further responded, "No," or, "No findings," to the defendant's requests for articulation that asked: "Did the court make any findings as to the fair market value and equity of the alleged house in Jamaica . . . [o]ver what period of time did the court find that the parties allegedly contributed to expenses for a house in Jamaica and in what amount(s) . . . [d]id the court make a finding as to encumbrances on the property in Jamaica and what were those findings . . . [and] [d]id the court find that the defendant had the financial ability to pay the plaintiff $20,000 in [four] years and what facts supported said finding?"

We begin by setting forth the standard of review and legal principles relevant to the issue before us. As previously noted, "[t]he trial court has broad discretion in fashioning its financial orders, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . This deferential standard of review is not, however, without limits. There are rare cases in which the trial court's financial orders warrant reversal because they are, for example, logically inconsistent . . . or simply mistaken. . . . We cannot countenance financial orders that are the product of mistake . . . ." (Citations omitted; internal quotation marks omitted.) *Traystman* v. *Traystman*, supra, 141 Conn. App. 795.

In *Gyerko* v. *Gyerko*, 113 Conn. App. 298, 305, 966 A.2d 306 (2009), this court determined that the trial court's failure to find that the plaintiff owned real property was not clearly erroneous. In *Gyerko*, "the defendant testified that the plaintiff owned property, a house and perhaps some land, in her hometown in Romania" and that "he was a co-owner and had a paper on it but

that the plaintiff hid it from him." (Internal quotation marks omitted.) Id. In its decision, this court emphasized that "[t]he only evidence before the [trial] court was the defendant's testimony, unsupported by a deed or any other document, and devoid of basic information, such as the address of the property or the name of the plaintiff's hometown." Id., 305–306. This court further acknowledged that this was "not a case in which the undisputed probative evidence was so overwhelming that the [trial] court was not free to disregard it." Id., 306. This court concluded "that the [trial] court's failure to accept the defendant's testimony and to find that the plaintiff owned property in Romania was not clearly erroneous." Id.

Here, the record reflects that the only evidence at trial concerning the ownership of the property in Jamaica was the testimony of the defendant and the plaintiff. The defendant testified that the property in Jamaica was a family residence, that it was his mother's house where his brother lived, that if the property was sold his mother would be the one to sign the deed and receive the proceeds from the sale, that he had contributed various amounts of money to the property to fix it up and the amount that he would contribute at a given time ranged between $700 to $1100. The record also reveals that when the plaintiff was asked at trial whether she had any proof that the defendant was the record owner of the property in Jamaica, she responded in the negative. The court then proceeded to acknowledge that neither party's financial affidavits reflected that the defendant was the record owner of any property in Jamaica. Analogous to the lack of supporting evidence in *Gyerko*, here there was also no documentary evidence submitted at trial regarding the property in Jamaica, the deed, the mortgage, the assessment of the property, the tax bills or any documentation that established the ownership, address or fair market value of the property, nor any liens or encumbrances on the property. Nor was there testimony that supported the court's finding that the defendant was the exclusive owner of the property in Jamaica.

The record further contains the court's responses, "No findings," and, "No," to the respective requests. to the defendant's motion for articulation, which asked: "Over what period of time did the court find that the parties allegedly contributed to expenses for a house in Jamaica and in what amount(s) . . . [d]id the court find that the defendant had the financial ability to pay the plaintiff $20,000 in [four] years and what facts supported said finding?" We are also mindful that contrary to "the long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards"; *Greco* v. *Greco*, supra, 275 Conn. 361; the court, in its articulation, made no such determination as to whether the defendant had the ability to pay the plaintiff $20,000 within four years.

In light of the foregoing, it is clear that the basis for the court's financial order, i.e., that the defendant owned the property in Jamaica and requiring him to pay the plaintiff $20,000 reflecting her contributions to that property, was flawed because there was no evidence to reasonably support such factual findings. Therefore, the court abused its discretion with respect to this claim.

Because "[t]he issues involving financial orders are entirely interwoven," "[t]he rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Citation omitted; internal quotation marks omitted.) Id., 354. Accordingly, as we find the mosaic doctrine applicable, we reverse in part the judgment of the trial court.

The judgment is reversed as to the financial orders and the contempt order and the case is remanded for further proceedings as to all of the financial orders in accordance with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date that this case was submitted.

[1] In his brief, the defendant explains that the amount the court ordered him to pay the plaintiff from his Chase retirement account was the sum of 40 percent of $76,074.97. In one section of his brief the defendant states that that sum is $30,429.99; however, throughout the rest of his brief he states that the sum is $30,425.98. After reviewing the record, we believe that the accurate amount is $30,425.98, as the court, by way of an articulation, clarified that $76,064.97 was the sum of the defendant's Chase retirement account.

[2] We note that throughout his brief, the defendant claims that the court ordered him to pay the plaintiff $20,000 within two years; however, the court's memorandum of decision provides that the time period in question is actually four years.

[3] Practice Book § 25-5 (b) (1) provides that "[n]either party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action."

[4] The automatic orders the plaintiff contends that the defendant violated, provide: "Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action." Practice Book § 25-5 (b) (1).

[5] On July 10, 2015, the plaintiff filed a postjudgment motion seeking a hearing and notice to address her postjudgment motion for modification, i.e., motion for contempt and order. In particular, in the plaintiff's postjudgment motion for contempt and order, she requested the court to find the defendant in wilful contempt of the financial orders set forth in the court's memorandum of decision. According to the plaintiff, the defendant wilfully and deliberately failed and refused to provide the plaintiff any of the disputed money in his retirement account, and, therefore, she requested that the court find the defendant in wilful contempt of the January 15, 2015 orders. Shortly thereafter, on August 27, 2015, the parties entered an agreement disposing of the plaintiff's postjudgment motion for contempt. In that agreement, the parties agreed that within ten days from the date of the agreement, the defendant would transfer the full amount of his retirement account, "value as of date of dissolution," to the plaintiff.